UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

E.H.,

               Plaintiff,

    v.

ISSAQUAH SCHOOL DISTRICT,
et al.,

               Defendants.

CASE NO. C23-1743JLR

ORDER ON ADMINISTRATIVE
APPEAL

## I.    INTRODUCTION

Plaintiff E.H. ("Parent") appeals on behalf of her child, R.M., from the decision of

an administrative law judge ("ALJ") holding that Respondent Issaquah School District

(the "District") upheld its obligations under the Individuals with Disabilities Education

Act ("IDEA"), 20 U.S.C. § 1400, *et seq*.  The court has reviewed the administrative

record (AR (Dkt. # 16)), the parties' submissions (Parent Br. (Dkt. # 34); District Br.

(Dkt. # 44); Parent Resp. (Dkt. # 46); District Resp. (Dkt. # 48)), the balance of the

1  record in this case, and the applicable law.  Being fully advised,[1] the court AFFIRMS the

2  ALJ's decision.

## II.    BACKGROUND

The court first discusses the statutory context and then turns to the factual

background of this case.

### A.    Statutory Context

The IDEA is "a comprehensive educational scheme, conferring on disabled

students a substantive right to public education."  *J.W. v. Fresno Unified Sch. Dist.*, 626

F.3d 431, 432 (9th Cir. 2010) (cleaned up).  Under the IDEA, states that receive federal

funding for public education must establish policies and procedures to ensure that all

children with disabilities have access to a free appropriate public education ("FAPE").

20 U.S.C. § 1412(a)(1)(A); *see also* 20 U.S.C. § 1400(d)(1)(A) (noting statutory purpose

"to ensure that all children with disabilities have available . . . a free appropriate public

education that emphasizes special education and related services designed to meet their

unique needs"); 20 U.S.C. § 1401(9) (further defining a FAPE).

The individualized education program ("IEP") is the "centerpiece" of the IDEA's

system for delivering a FAPE to children with disabilities.  *Endrew F. v. Douglas Cnty.*

*Sch. Dist.*, 580 U.S. 386, 391 (2017) (citation omitted).  An IEP is a written statement for

a child with a disability that must meet detailed statutory requirements, including

---

[1] Neither party requests oral argument (*see* Parent Br. at 1; District Br. at 1), and the court concludes that oral argument is not necessary to decide this appeal.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1    containing statements of the child's present academic achievement, measurable annual

2    goals, and the special education and related services that the child will receive.  *See* 20

3    U.S.C. § 1414(d)(1)(A)(i).

4        Under the IDEA, as implemented in Washington, a child's parent, a state agency,

5    or a school district may request an initial evaluation to determine if the child qualifies as

6    a child with a disability.[2]  20 U.S.C. § 1414(a)(1).  The IDEA requires "a full and

7    individual initial evaluation" before a school district may provide special education and

8    related services to a child.  20 U.S.C. § 1414(a)(1)(A).  If the evaluation determines that a

9    child qualifies for services, the IDEA then requires that the child have an IEP in effect

10    "[a]t the beginning of each school year[.]"  20 U.S.C. § 1414(d)(2)(A).

11        An IEP team, which includes teachers, school officials, and the child's parents,

12    develops the IEP.  *See* 20 U.S.C. § 1414(d)(1)(B).  To do so, the IEP team must consider

13    the results of the child's initial evaluation, as well as other statutory items.  *See, e.g.*, 20

14    U.S.C. § 1414(d)(3)(A)-(B).  Once an IEP is in effect, a school district must ensure that

15    the child's IEP team (1) reviews the IEP at least annually to determine whether the child

16    is achieving the IEP's goals, and (2) revises the IEP as appropriate to address, in relevant

17    part, any lack of expected progress, the results of any reevaluations of the child, and

18    information about the child provided by the parents.  20 U.S.C. § 1414(d)(4)(A).

19

20

21    _____

    [2] The IDEA refers to a "local educational agency[,]" sometimes referred to as a "LEA,"
    rather than a school district.  *See, e.g.*, 20 U.S.C. § 1414(a)(1)(A).  The court refers to school
22    districts to reflect Washington's terminology in implementing the IDEA.  *See* WAC 392-172A-
    01115.

1    In addition to reviewing a child's IEP, the IDEA also requires school districts to

2  regularly reevaluate students with disabilities every one to three years unless the parent

3  and school district agree otherwise. *See* 20 U.S.C. § 1414(a)(2)(B); WAC 392-172A-

4  03015(2) (same).  Either the school district or a parent may request a reevaluation of the

5  child.  20 U.S.C. § 1414(a)(2).

6    When school districts cannot adequately serve children with disabilities, they

7  sometimes place children into private schools that can provide more services. *See*

8  *Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1138 n.5 (9th Cir. 2021).  When

9  that occurs, the IDEA still requires IEPs, and placement occurs at no cost to the parents.

10  20 U.S.C. § 1412(a)(10)(b).  When a parent enrolls a child in private school *without* a

11  referral by the school district, however, "the district only needs to prepare an IEP if the

12  parents ask for one." *Capistrano*, 21 F.4th at 1138.  Additionally, the school district only

13  needs to reimburse the parent for private education if the school district failed to make a

14  FAPE available to the child "in a timely manner" before the private school enrollment.

15  20 U.S.C. § 1412(a)(10)(C).  Put another way, a parent can only receive reimbursement

16  for a unilateral private placement if "(1) [] the public placement violated the IDEA, and

17  (2) [] the private school placement was proper under the Act." *Baquerizo v. Garden*

18  *Grove Unified Sch. Dist.*, 826 F.3d 1179, 1188 (9th Cir. 2016) (quotation and citation

19  omitted).[3]

20

21    [3] "If both criteria are satisfied, the district court must then exercise its broad discretion
    and weigh equitable considerations to determine whether, and how much, reimbursement is
22  appropriate." *Baquerizo*, 826 F.3d 1179, 1188 (9th Cir. 2016) (cleaned up).

1    When parents and educators disagree about "any matter relating to the

2    identification, evaluation, or educational placement of the child," including providing a

3    FAPE to the child and the contents of the child's IEP, they may turn to the dispute

4    resolutions procedures established by the IDEA.  *See* 20 U.S.C. § 1415(b)(6), (e),

5    (f)(1)(B).  The IDEA provides for a "due process hearing" before an impartial agency.

6    *See* 20 U.S.C. § 1415(f)(1)(A).  The party requesting a due process hearing must do so

7    within two years of the date the party knew or should have known about the act forming

8    the basis of the party's complaint.  20 U.S.C. § 1415(f)(3)(C); *see also* WAC 392-172A-

9    05080(2) (same, subject to exceptions that do not apply here).  In Washington, ALJs at

10    the Office of Administrative Hearings conduct IDEA due process hearings.  RCW

11    28A.155.020; WAC 392-101-010(2).  The IDEA requires that an ALJ decide a dispute

12    "on substantive grounds based on a determination of whether the child received a

13    [FAPE]."  20 U.S.C. § 1415(f)(3)(E)(i).  "[A]t the conclusion of the administrative

14    process, the losing party may seek redress in state or federal court."  *Endrew F.*, 580 U.S.

15    at 392 (citing 20 U.S.C. § 1415(i)(2)(A)).

16    **B.    Factual Background**

17         1.  R.M.'s 2018 IEP and Prior Evaluations

18    R.M. resides within the District.  (AR 1766.)  In April 2011, the District

19    performed an initial evaluation of R.M. and determined that she was eligible for special

20    education services under the category of developmental delay.  (AR 2035.)  The District

21    then reevaluated R.M. in March 2013 and determined that R.M. continued to be eligible

22    under the same category.  (AR 2035.)

1    In October 2015, Parent arranged for Dr. Gayle Fay to assess R.M., and Dr. Fay

2    diagnosed R.M. with moderate intellectual disability and attention deficit disorder.

3    (AR 34, 2035.)  Following that evaluation, in March 2016, the District reevaluated R.M.

4    and determined that she was eligible for special education services under the category of

5    intellectual disability.  (AR 2035-36.)

6    In April 2016, R.M.'s IEP team determined that she would benefit from services in

7    the District's LRC-II program.  (AR 2036.)  Accordingly, R.M. transitioned to the

8    LRC-II program at Cougar Ridge Elementary School ("Cougar Ridge") in the District in

9    April 2016, during her second-grade year.  (AR 2036.)

10    During the 2017-2018 school year, R.M. was in fourth grade and enrolled part-

11    time at Cougar Ridge.  (AR 1766.)  Parent also paid for R.M. to receive instruction at

12    Yellow Wood Academy ("Yellow Wood"), a private school on Mercer Island that

13    provides only one-on-one instruction and "very small group" classes for its students.

14    (*See* AR 39, 313, 1766; *see also* AR 40 (Parent's testimony that Yellow Wood's program

15    was "one-on-one only").)

16    In March 2018, the District reevaluated R.M. again.  (AR 1767.)  Because of the

17    complexity of this reevaluation, Parent agreed to allow the District 60 school days to

18    complete the reevaluation.  (AR 3221.)  Dr. Julie Davies, a healthcare provider selected

19    by Parent, submitted data and recommendations to assist in the reevaluation.  (AR 3221.)

20    The District also contracted with Dr. Allison Brooks to provide additional data and

21    recommendations.  (AR 3221.)  Ultimately, the reevaluation team recommended that

22    R.M. receive specially designed instruction ("SDI"), and related services of occupational

1   therapy ("OT") and speech language pathology ("SLP").  (AR 3221.)  The District

2   concluded that R.M. continued to be eligible for special education services under the

3   category of intellectual disability.  (AR 3221.)  On April 5, 2018, the District and Parent

4   met to develop an IEP for R.M.  (AR 1767.)

5        At that meeting, Parent requested that the District pay to privately place R.M. at

6   Yellow Wood full-time instead of providing a public education in the District.  (AR

7   2130.)  Except for Parent's selected healthcare provider, however, no other individual at

8   the IEP team meeting expressed concern about R.M. remaining in public school.

9   (AR 3222.)  Dr. Brooks stated that the proposed IEP provided appropriate special

10  education to R.M.  (AR 3222.)  Ultimately, because R.M.'s IEP team believed that the

11  District could provide an appropriate education without a private placement at Yellow

12  Wood, the District rejected Parent's request.  (AR 2130.)  Parent requested a follow-up

13  meeting with the IEP team so that the team could further consider placing R.M. at Yellow

14  Wood, but the District denied the request.  (AR 2130.)  The District informed Parent that

15  it would implement R.M.'s new IEP on April 20, 2018.  (AR 2130.)

16       One day before the IEP went into effect, Parent notified the District that she

17  intended to unilaterally place R.M. at Yellow Wood full-time and to seek reimbursement

18  from the District.  (AR 3222.)  The District again notified Parent that it was denying her

19  request for a District-funded placement at Yellow Wood.  (AR 3222-23.)  Parent

20  unenrolled R.M. from the District at the end of the 2017-2018 school year without further

21  challenging the April 2018 IEP.  (*See* AR 3223.)

22

1    From fall 2018 to spring 2021, Parent did not enroll R.M. in public school.  (AR

2    1767.)  Instead, she enrolled R.M. at various private schools, including Yellow Wood.

3    (AR 39-42, 1767.)  Parent was satisfied with R.M.'s progress at Yellow Wood, but she

4    also enrolled R.M. in other private schools from 2018 to 2021 "in large part due to cost"

5    because Yellow Wood offered "a very expensive program" and because R.M. could not

6    socialize with her peers because her classes at Yellow Wood were all taught one-on-one

7    by R.M.'s instructors.  (AR 40.)  Parent, however, came to believe that one of the other

8    private schools "was not a good fit" for R.M. (AR 42.)  Separately, Parent "did not see

9    [the] academic progress that [Parent was] hoping for" at another private school, and she

10   felt that "the other kids in the environment became very much a distraction" to R.M.  (AR

11   42-43.)

12       2.  Parent's 2021 Request for a FAPE for R.M.

13       On April 6, 2021, Parent emailed Joan Lawson, Director of Secondary Special

14   Education at the District,[4] as follows:

15       We are considering [] public school as a potential option for our daughter
        [R.M.] for the next school year.  [R.M.] is currently in 7th grade and is
16      attending a private school.  Can you advise of next steps?  Would this be a
        reevaluation?

17   (AR 1767.)

18

19

20

---

21   [4] Ms. Lawson had no prior contact with Parent or R.M. and had not been involved with
     R.M.'s prior educational program in the District.  (AR 3209.)  Parent found Ms. Lawson's name
22   and contact information on the District's website.  (AR 128-29.)

1    Parent received an automatic reply that Ms. Lawson was out of the office.

2    (AR 1767.)  On April 12, 2012, the same day that Ms. Lawson returned to the office, Ms.

3    Lawson responded to Parent's email:

4         I am happy to help advise on next steps!  The first thing to do is to register
          [R.M.] at her home middle school here [in the District]. . . .  Our registration
5         is online which you can find a link to on your home middle school website.
          As for the school evaluation, I cannot tell you if a re-evaluation is necessary.
6         The school psychologist would have to review the paperwork and determine
          whether a re-evaluation is needed or not.  I assume since you have an
7         evaluation, [R.M.] also has an IEP?

8    (AR 1767.)

9         At some point after receiving this message, Parent retained legal counsel.

10   (AR 127.)  On April 20, 2021, Parent then replied as follows:

11        Thanks for your email.  I'm still in the process of deciding whether I want to
          [re-enroll R.M.] in public school.  Part of my decision making process is to
12        see what specially designed instruction and services [R.M.] qualifies for.
          [R.M.] has been out of the District for a few years now. . . . [R.M.] did have
13        an IEP when she was enrolled in public school.  My understanding is that it
          is not necessary for me to enroll [R.M.] in [the District] to obtain an
14        evaluation and an offer of FAPE since I am a resident within the . . . District
          and [R.M.] lives in my home.  I assume that an evaluation would be needed
15        since it has been a few years but please advise if you believe I am mistaken
          and we can jump to an IEP team meeting for [R.M.]

16
     (AR 924.)  Parent emailed Ms. Lawson three days later, asking "[a]ny follow up on this?"
17
     (AR 926.)  Parent then sent Ms. Lawson another email on April 27, 2021, requesting a
18
     response and asking "[i]s there someone else that you'd advise I work with?"  (AR 928.)
19
          On April 30, 2021, Parent emailed Ms. Lawson again, in relevant part:
20
21        I have not received a reply from you to my most recent emails.  I am formally
          requesting that the [] District evaluate my child, [R.M.]  [She] was last
22        evaluated by the District in March of 2018.  [R.M.'s] reevaluation would
          have occurred during March of 2021.  Based on the information I previously

ORDER - 9

provided, I am concerned that the [] District is not meeting its . . . obligation to my daughter. . . . [The] District continues to be responsible for evaluating [R.M.] given that she is a student with a disability that has a history of requiring special education[.]

(AR 931.)[5]

On the morning of May 13, 2021, Parent's attorney contacted counsel for the District, requesting, in relevant part, a response within six days. (AR 933.) Parent's counsel also stated that the District must evaluate R.M. "at least two weeks prior to the start of the 2021-22 school year." (AR 933.)

Later that morning, Ms. Lawson responded to Parent, offered to speak at 2:00 p.m. that afternoon, and asked to set up a phone call "as soon as possible" to explain why she did not respond to Parent's emails and to tell Parent the "next steps to move this process forward." (AR 931.) Ms. Lawson also initiated the reevaluation process that same day. (AR 2460.) When she spoke with Parent, Ms. Lawson explained that she mistakenly had been disregarding Parent's emails because of Parent's email address.[6] (AR 3210.)

---

[5] Parent did not reach out to other individuals at the District after Ms. Lawson stopped responding, including Sharine Carver, the Executive Director of Special Services for the District. (AR 130-31, 3220, 3223.) Ms. Carver was Parent's main contact for special education issues in 2018, when R.M. left public school, and was previously involved in denying Parent's request that the District fund R.M.'s placement at Yellow Wood. (AR 3221-23.) Ms. Carver's name and contact information were also available on the District's website. (AR 3223.) Parent stated that she did not reach out to anyone else because Ms. Lawson seemed like the correct person and involving another person "just seemed [like] overkill for this type of request[.]" (AR 131; *see also* AR 130 ("It's just – I felt like I hit the right person . . . . [s]o I kept trying with Ms. Lawson.")).

[6] Parent's email address does not include Parent's name. (AR 3210.) Instead, it contains a business name similar to a company from which Ms. Lawson used to rent ski equipment. (*See* AR 360-61, 3210.)

1    3.  <u>R.M.'s 2021 Reevaluation and 2022 IEP</u>

2    A school psychologist in the District, Emily Marchewka, coordinated data

3    gathering for and conducted R.M.'s reevaluation.  (AR 370-71, 384-85.)  On May 17,

4    2021, Ms. Marchewka notified Parent that the District could implement R.M.'s most

5    recent IEP during the reevaluation period if Parent decided to enroll R.M. in the District.

6    (AR 2163-64.)  Ms. Marchewka sent Parent a consent form for the reevaluation on May

7    23, 2021.  (AR 2166.)  Parent did not ask for an IEP team meeting before the end of the

8    2020-2021 school year, because she believed "we had started on a reevaluation [and it]

9    made sense to get all of our facts in line in order to support a productive IEP meeting."

10   (AR 228.)

11   Parent submitted a signed consent form for the reevaluation on May 24, 2021.

12   (AR 2166.)  The next day, Parent asked to expand the scope of R.M.'s reevaluation by

13   adding the area of sensory.  (AR 2165.)  Ms. Marchewka sent an updated consent form

14   later that day, and Parent signed and returned it on May 26, 2021.  (AR 2472.)

15   Ms. Marchewka then began the reevaluation by requesting additional information

16   from Parent regarding R.M., obtaining private evaluation reports from multiple providers,

17   and contacting R.M.'s private school.  (AR 384-85, 971, 2173, 2406-16, 2488.)  As part

18   of this effort, Ms. Marchewka obtained additional authorization from Parent to exchange

19   information with R.M.'s private schools.  (*See, e.g.*, AR 2477.)  Additionally, because

20   R.M.'s most recent primary teacher had passed away, Ms. Marchewka identified and

21   reached out to multiple instructors who had worked with R.M.  (AR 285, 2479.)

22

1    The District's 2020-2021 school year ended on June 17, 2021.  (AR 2351.)  Ms.

2    Marchewka continued working on R.M.'s reevaluation after classes ended for the

3    summer, including by performing standardized testing measures with R.M. and

4    continuing to gather information from instructors at R.M.'s private school.  (*See* AR 975,

5    2190-2212.)  Ms. Marchewka also arranged for further testing with R.M. and obtained

6    additional information and authorization from Parent during August 2021, while the

7    District's students were still on summer break.  (AR 2515-17.)

8    On August 6, 2021, Parent notified Yellow Wood that she had registered R.M. and

9    asked whether Yellow Wood needed her to complete an enrollment agreement,

10   application, and a student schedule request.  (AR 2520.)  That same day, Parent also

11   attempted to enroll R.M. in public school at the District.  (AR 677.)

12   On August 16, 2021, Parent provided a letter to the District from her attorney

13   conveying her intent to unilaterally place R.M. at Yellow Wood "and to seek

14   reimbursement from the District for the private placement" until the District offered a

15   FAPE.  (AR 985-86.)  The letter indicated that Parent would assess with R.M.'s IEP team

16   any offer the District provided, and she would determine whether the District's offer "is

17   calculated to meet [R.M.'s] needs."  (AR 986.)  The letter also cited R.M.'s "complex

18   learning profile" and history with Yellow Wood to support Parent's decision to place

19   R.M. and Yellow Wood.  The letter warned that "[i]f the District fails to provide [R.M.]

20   with an appropriate placement, [R.M.] will remain at [Yellow Wood] and [Parent will]

21   seek reimbursement for all costs associated with [that] placement[.]"  (AR 986.)

22

1    The District's 2021-2022 school year began on August 31, 2021.  (AR 2352.)

2  Two days later, on September 2, 2021, Parent retained Dr. Davies to perform a private

3  evaluation of R.M.  (AR 139, 386.)  Parent testified that she selected Dr. Davies because

4  Dr. Davies "takes her time," in conducting evaluations, and, "although it may take her

5  time to do it, she really . . . goes through the painstaking detail" in a way that Parent

6  considered "exceptional."  (AR 142-43.)  Parent also testified that she did not retain Dr.

7  Davies earlier in the year because she wanted to give R.M. "a little bit of a break" and

8  wanted the District to assess R.M. before Dr. Davies.  (AR 139, 141.)

9    R.M. began to attend Yellow Wood on September 8, 2021.  (AR 221.)

10    On September 17, 2021, the District sent Parent a draft copy of R.M.'s

11  reevaluation.  (AR 2180.)  On September 22, 2021, Parent and her counsel attended a

12  meeting with the District to discuss and finalize the reevaluation.  (AR 142; *see also*

13  AR 2181-2279 (September 2021 reevaluation).)  Parent did not express concerns about

14  the reevaluation report.  (AR 142, 386.)  At the end of the September 22, 2021 meeting,

15  Parent told the District that she had retained Dr. Davies to privately evaluate R.M.  (AR

16  386.)

17    The District provided Parent with R.M.'s draft IEP on October 16, 2021, to be

18  discussed at an IEP team meeting on October 21, 2021.  (AR 2282, 2284.)  Parent then

19  stated that she did not want to have an IEP team meeting before Dr. Davies finished

20  evaluating R.M., and she asked the District to reschedule.  (AR 2284.)  The District

21  cautioned Parent that an IEP would not be ready within 30 days of R.M.'s reevaluation if

22

1    the team meeting was rescheduled, and Parent said that she understood.  (AR 2284.)  The

2    District then rescheduled the IEP team meeting for November 18, 2021.  (AR 2291.)

3            On November 15, 2021, the District provided Parent an updated draft IEP.  (AR

4    2813.)  The evening before the IEP team meeting, however, on November 17, 2021,

5    Parent sent the District Dr. Davies's private evaluation of R.M. and two additional private

6    evaluation reports that Parent had obtained. (AR 3197; *see also id* at 2736-63 (Dr.

7    Davies's report).)  The District did not have enough time to review these materials before

8    the IEP team meeting.  (AR 2860.)  At the meeting, Parent asked that Dr. Davies present

9    her report to the IEP team, and this presentation took up the entire scheduled time.  (AR

10   456, 2860.)  Because of this, the IEP team was not able to present the draft IEP, and the

11   District had to schedule another IEP team meeting.  (AR 456, 2860.)

12           On January 6, 2022, R.M.'s IEP team met again.[7]  (AR 3395.)  After reviewing

13   R.M.'s evaluations and records, Tammy Unruh, the District's representative at the

14   meeting, came to believe that the District could provide R.M. with appropriate

15   educational programming in a less restrictive setting than Yellow Wood, including

16   through small and whole group instruction.  (AR 3198-99.)  Parent, however, was

17   reluctant to allow R.M. to receive education services at the District, and Ms. Unruh was

18   concerned that R.M. did not have opportunities for social engagement at Yellow Wood

19   because of the one-on-one format of its instruction.  (AR 3198-99.)  Because Ms. Unruh

20

21           [7] The District offered Parent earlier dates for an IEP team meeting in December 2021, but
     Parent declined because the District's occupational therapist was not available, and Parent did
22   not want to excuse the occupational therapist.  (AR 2865.)

1    wanted to avoid a dispute with Parent over R.M.'s placement, and because R.M. had been

2    attending Yellow Wood for much of the 2021-2022 school year, Ms. Unruh offered a

3    split program between Yellow Wood and the District.  (AR 3199.)  Ms. Unruh intended

4    the offer as a compromise with Parent, and she continued to believe that R.M. could

5    receive an appropriate education at the District.  (AR 3199.)  Parent agreed to continue

6    the IEP team meeting again to develop scheduling options for R.M. to split her time.

7    (AR 3199.)  Although R.M.'s IEP team were not able to finalize R.M.'s IEP until March

8    15, 2022, the District agreed to retroactively fund R.M.'s placement at Yellow Wood

9    beginning January 21, 2022.  (AR 3199, 3201.)

10        4.  The Administrative Proceeding

11        On July 27, 2022, Parent filed a due process hearing request, alleging, in relevant

12    part, that the District denied R.M. a FAPE and that its failure to reevaluate R.M. and to

13    offer "an appropriate placement" before the 2021-2022 school year caused Parent to

14    enroll R.M. at Yellow Wood for that year.  (AR 703, 706-07.)  Parent requested various

15    relief, including reimbursement of tuition, transportation, and other related costs for R.M.

16    to attend Yellow Wood during the 2021-2022 school year.  (AR 707.)  She also requested

17    reimbursement of the cost of Dr. Davies's evaluation of R.M.  (AR 707.)

18        In May 2023, the ALJ conducted a four-day administrative hearing in which

19    twelve different witnesses testified.  (AR 1966-67.)  Three months later, in August 2023,

20    the ALJ issued a 57-page decision that included findings of fact, conclusions of law, and

21    a final order.  (AR 1965-2023.)  In relevant part, the ALJ concluded that the District did

22    not need to provide a FAPE to R.M. until January 21, 2022—the effective date that the

1    District agreed to begin reimbursing Parent for placing R.M. at Yellow Wood—because

2    Parent had revoked consent for the District to provide special education services when

3    she withdrew R.M. from the District in 2018, and had unilaterally placed R.M. at Yellow

4    Wood.  (AR 1990.)   Accordingly, the ALJ concluded that, "regardless of whether any

5    procedural violations occurred[,]" Parent necessarily failed to show that the District

6    denied R.M. a FAPE.  (AR 1990.)  The ALJ went on to assess Parent's claimed

7    procedural violations, two of which are relevant here.

8            First, the ALJ concluded that the District timely initiated R.M.'s reevaluation in

9    2021.  (AR 1993, 1995.)  In relevant part, the ALJ concluded that the District did not

10   need to reevaluate R.M. within three years of her last evaluation in March 2018 because,

11   after the 2017-2018 school year and through the 2020-2021 school year, Parent had

12   placed R.M. in a private school.  (AR 1995.)  The ALJ also concluded that both Parent

13   and the District contributed to the delay between Parent's first email to Ms. Lawson on

14   April 6, 2021, and the District's decision to reevaluate R.M. on May 13, 2021.  (AR

15   1995.)  The ALJ stated that the approximately five-week delay was "less than ideal[,]"

16   but she concluded that the delay in initiating R.M.'s reevaluation was not unreasonable in

17   the circumstances.  (AR 1995.)  The ALJ also concluded that the District completed

18   R.M.'s reevaluation within 35 school days of Parent's consent to the reevaluation, as is

19   required in Washington.  (*See* AR 1996 (citing WAC 392-172A-03015(3)).)

20           Second, the ALJ concluded that the District was not required to have an IEP in

21   place for R.M. by the beginning of the 2021-2022 school year because R.M. was neither

22   enrolled in nor being served by the District during the 2020-2021 school year.  (AR 2001-

05.)  In the alternative, the ALJ concluded that the District met any requirement to have an IEP in place by offering to implement R.M.'s April 2018 IEP in the interim.  (AR 2004-05.)  The ALJ also rejected Parent's argument that the 2018 IEP was inappropriate for R.M. and could not provide her with a FAPE because Parent did not challenge the 2018 IEP within the IDEA's two-year statute of limitations.  (AR 2004.)

## III.    ANALYSIS

Parent asserts that the court should accord the ALJ's findings no deference because those findings were not thorough and careful.  (Parent Br. at 18, 20.)  In support, Parent argues that the ALJ incorrectly concluded that the District did not need to provide a FAPE to R.M. because Parent revoked consent for R.M. to receive a FAPE by enrolling R.M. in private school from 2018 to 2021.  (*Id.* at 22-23.)  Next, Parent asserts that the District deprived R.M. of a FAPE by violating the IDEA in two separate ways: (1) by unreasonably delaying R.M.'s reevaluation process; and (2) by failing to have a new IEP in effect for R.M. at the start of the 2021-2022 school year.  (Parent Br. 24-36; Am. Compl. (Dkt. # 26) ¶¶ 4.2-4.3.)

After discussing the applicable standard of review and the ALJ's conclusion that the District did not need to provide a FAPE to R.M., the court addresses in turn Parent's arguments that the District violated the IDEA.

## A.    Standard of Review

The IDEA allows a party aggrieved by the findings and decision made at a due process hearing to bring a civil action.  20 U.S.C. § 1415(i)(2)(A).  In such an action, the court must receive the records of the administrative proceedings; hear additional evidence

1    at the request of a party; and, basing its decision on the preponderance of the evidence,

2    grant appropriate relief.  20 U.S.C. § 1415(i)(2)(C).

3         Unlike judicial review of other agency actions, courts in IDEA cases review *de*

4    *novo* whether a school district has provided a FAPE.  *M.C. v. Antelope Valley Union*

5    *High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017).  If an ALJ's factual findings are

6    "thorough and careful" then courts may give "some deference" to those findings and may

7    exercise their discretion to determine how much deference to give.  *Id.* (quotations

8    omitted); *see also Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1053 (9th Cir.

9    2022) ("[T]he Ninth Circuit does not employ a highly deferential standard of review;

10   rather, it gives due weight to the state administrative proceedings.") (cleaned up).  Courts

11   give more deference when an ALJ produces particularly thorough and careful findings,

12   evinces impartial consideration of all the evidence, and demonstrates a sensitivity to the

13   complexity of the issues presented.  *See J.W.*, 626 F.3d at 438.

14        "Normally, the party alleging a violation of the IDEA bears the burden of showing

15   that the services received amounted to a denial of a FAPE."  *M.C.*, 858 F.3d at 1200

16   (citing *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005)).  And, on judicial review of an

17   administrative decision, "the appellant bears the burden of demonstrating that the ALJ's

18   decision was incorrect."  *Crofts*, 22 F.4th at 1053.

19   **B.    The ALJ's Conclusion that the District did not Need to Provide a FAPE**

20        The ALJ found that Parent revoked consent for the District to provide special

21   education services to R.M. when Parent notified the District in April 2018 that she was

22   withdrawing R.M. from the District.  (AR 1990.)  Accordingly, the ALJ concluded that

the District did not need to make a FAPE available to R.M. from the time R.M. left

public school in May 2018 and until the district agreed to start funding R.M.'s placement

at Yellow Wood on January 21, 2022. (AR 1990.) Parent argues that the ALJ erred and

that the District needed to provide a FAPE in response to the Parent's request for a FAPE

in April 2021. (Parent Br. at 23-24.) Parent also argues, relatedly, that the ALJ did not

make thorough and careful findings, and that the court should afford no deference to

those findings. The District takes no position about the ALJ's conclusion that the District

did not owe R.M. a FAPE upon Parent's request; rather, it argues that this portion of the

ALJ's decision is irrelevant and asserts that the court should still afford some deference

to the ALJ's findings. (District Br. at 17-18.)

The court first discusses the ALJ's conclusion that the District did not need to

provide a FAPE to R.M. until it agreed to fund R.M.'s placement at private school, and

concludes that the ALJ erred. The court then addresses the impact of the ALJ's

erroneous conclusion and how much deference, if any, to afford the ALJ's findings.

    1.  The District Needed to Provide a FAPE to R.M. Upon Parent's Request.

"If a student enrolled in a private school needs special education and related

services, the [school district] where the child resides is responsible for making [a] FAPE

available to the child." *J.B. v. Kyrene Elementary Sch. Dist. No. 28*, 112 F.4th 1156,

1165 (9th Cir. 2024). Thus, even if a parent unilaterally places a child in private school,

the child's school district must still offer a FAPE at the request of the parent, including

by convening an IEP team meeting and reviewing and revising the child's existing IEP as

appropriate. *See Bellflower Unified Sch. Dist. v. Lua*, 832 F. App'x 493, 496 (9th Cir.

2020); *see also J.B.*, 112 F.4th at 1163-64 (explaining that a school district can violate the

IDEA by refusing to prepare a new IEP, to make a new offer of FAPE, and to conduct

evaluations necessary to formulate an IEP for a child enrolled in private school, unless

the child's parent makes clear his or her intent not to re-enroll the child in public school).

Although the District did not need to revise R.M.'s IEP and update its offer of FAPE

while R.M. remained in private school without any word from Parent, the District needed

to act once Parent requested that it do so. *See Capistrano*, 21 F.4th at 1138 ("[W]hen

parents withdraw a student from public school and place her in private school, all they

have to do is ask for an IEP, and then the district must prepare one.").

The court agrees with Parent and holds that her decision to withdraw R.M. from

public school did nothing to change the District's overarching obligation under the IDEA

to offer a FAPE to qualifying children in its jurisdiction.  Therefore, when Parent asked

the District to reevaluate R.M. and offer a FAPE in April 2021, the IDEA obligated the

District to do so.

2.  <u>The Court Affords No Deference to the ALJ's Findings.</u>

Parent next argues that the court should afford no deference to the ALJ's findings

because they were not thorough and careful.  Parent asserts that the ALJ made a

foundational legal error in concluding that the District did not need to provide a FAPE

and argues that the ALJ's other relevant findings are necessarily flawed.  (Parent Resp. at

3.)  For instance, Parent asserts that, in her view, the ALJ "was dismissive of relevant

testimony[.]"  (Parent Br. at 16.)  She also states that the ALJ requested Parent's counsel

to move on during the administrative hearing and characterized some of Parent's

1    evidence as not helpful.  (Parent Br. at 16-17; Parent Resp. at 20.)  The District argues

2    that the ALJ's legal error is "irrelevant," notes that the ALJ nevertheless addressed

3    Parent's claims that the District procedurally violated the IDEA, and asserts that Parent

4    failed to establish that the court should afford the ALJ's findings no deference.  (District

5    Br. at 17-18; District Resp. at 1-2.)

6          The court agrees with Parent that the ALJ made a significant, foundational legal

7    error.  By concluding that the District had no obligation to provide R.M. a FAPE until it

8    agreed to fund R.M.'s private school, the ALJ's findings concerning the District's alleged

9    procedural violations necessarily were only alternative findings.  (*See* 1995-99, 2004

10   (rejecting, in the alternative, Parent's claims that the District violated the IDEA and

11   Washington's implementing regulations, while reiterating the ALJ's view that Parent had

12   not proved that the District needed to provide R.M. a FAPE until January 20, 2022).)

13   Moreover, the ALJ expressly stated in her findings that she viewed some of Parent's

14   evidence as "extensive and repetitive" and believed that some of Parent's efforts were

15   "an unnecessary exercise [and] puzzling given the findings and conclusions [] that the

16   District did not have an obligation to make a FAPE available to [R.M.] [until] . . . January

17   20, 2022[.]"  (AR 2005.)

18         Because the record indicates that the ALJ's legal error caused her to consider the

19   evidence with less care, the court cannot conclude that the ALJ's findings were thorough

20   and careful.  The court affords no deference to the ALJ's findings.

21

22

1  **C.    Claimed Procedural Violations**

2       The court now turns to Parent's arguments that the District violated the IDEA.  In

3  formulating an IEP and providing a FAPE, a school district "must comply both

4  procedurally and substantively with the IDEA."  *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d

5  634, 644 (9th Cir. 2005) (citation omitted).  And, in assessing whether a student has

6  received a FAPE, courts conduct both a procedural and substantive inquiry to determine

7  whether a school district has violated the IDEA.  *See J.B.*, 112 F.4th at 1160.

8       Specifically, the IDEA provides that procedural inadequacies do not result in a

9  substantive violation and a FAPE denial unless they:  (1) "impeded the child's right to a

10 [FAPE]"; (2) "significantly impeded the parents' opportunity to participate in the

11 decisionmaking process"; or (3) deprived the child of educational benefits.  20 U.S.C.

12 § 1415(f)(3)(E); *see also* WAC 392-172A-05105 (same).  Put another way, [p]rocedural

13 compliance is essential to ensuring that every eligible child receives a FAPE," *Amanda J.*

14 *v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001), but "not all procedural

15 violations amount to a denial of a FAPE[,]" *J.B.*, 112 F.4th at 1160.

16      1.  The District Did Not Fail to Timely Reevaluate R.M.

17      Parent first argues that the District violated the IDEA by failing to begin

18 reevaluating R.M. without undue delay after Parent requested a reevaluation.  (Parent Br.

19 at 24-35.)  The court, however, disagrees that the District violated the IDEA in

20 reevaluating R.M.

21      "[U]pon a parent's request, a school district must evaluate a child residing in its

22 district for purposes of making a FAPE available to her, even if she is enrolled in private

1    school in another district." *Bellflower Unified Sch. Dist.*, 832 F. App'x at 495-96

2    (cleaned up).  The IDEA requires a school district to conduct an evaluation within a

3    reasonable time.  *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 796 (9th Cir. 2008); *M.D.*

4    *v. Colonial Sch. Dist.*, 539 F. Supp. 3d 380, 391-92 (E.D. Pa. 2021); *see also* WAC 392-

5    172A-03015(3)(a) (requiring school districts in Washington to complete reevaluations

6    within 35 school days of receiving parental consent).  What is reasonable in one set of

7    circumstances is not necessarily reasonable in another, and the "IDEA requires courts to

8    consider each child's case individually." *JG*, 552 F.3d at 798.  Accordingly, although

9    courts may consider whether a school district followed applicable timelines in relevant

10   state regulations, such timelines are not necessarily safe harbors, and "the ultimate and

11   dispositive question is whether the [d]istrict acted in a reasonable time." *Id.*

12          Initially, the parties dispute *when* Parent requested a reevaluation and triggered the

13   District's duty to reevaluate R.M.  Parent contends that she requested a reevaluation on

14   April 20, 2021.  (Parent Resp. at 6-8.)  The District argues that Parent did not request a

15   reevaluation until April 30, 2021.  (District Br. at 21-26.)

16          Generally, to request a reevaluation, a parent must do more than merely express

17   concern about a child's academic and behavioral progress or make nonspecific requests

18   for "help" or to "test [the child] for something[.]" *See Durbrow v. Cobb Cnty. Sch. Dist.*,

19   887 F.3d 1182, 1192 (11th Cir. 2018); *D.K. v. Abington Sch. Dist.* 696 F.3d 233, 247 n.5

20   (3d Cir. 2012); *see also H.D. v. Kennett Consol. Sch. Dist.*, No. 18-cv-3345-MMB, 2019

21   WL 4935193, at *24 n.11 (E.D. Pa. 2019) ("[A]lthough the parties continued to discuss

22   whether the District would evaluate [the child] . . . the Parents did not clearly request

1    further evaluation in anticipation of possible reenrollment.").  A parent also must do more

2    than merely indicate an interest "in finding out what programs the district can offer" and

3    have general conversations about special education programming.  *A.B. v. Abington Sch.*

4    *Dist.*, 841 F. App'x 392, 396 (3d Cir. 2021).  If, however, a parent "specifically

5    approach[es] the school district about re-enrollment and obtaining a new IEP," the district

6    must provide an offer of FAPE, including reevaluating the child as appropriate.  *See id.*

7    (quoting *James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 768 (6th Cir. 2000)).

8        The court agrees with Parent that she requested a reevaluation on April 20, 2021.

9    Although Parent did not actually phrase her communication as a request on that date,

10   Parent nevertheless stated that (1) she was deciding whether to re-enroll R.M. in public

11   school; (2) she wanted "to see what specially designed instruction and services" R.M.

12   qualified for; (3) R.M. previously had an IEP; (4) Parent understood that enrollment was

13   not necessary "to obtain an evaluation and an offer of FAPE"; and (5) she assumed "that

14   an evaluation would be needed" but was willing to "jump to an IEP team meeting[.]"

15   (AR 924.)  By indicating that R.M. had qualified for services in the past and that Parent

16   wanted an offer of FAPE and was willing to start a reevaluation or begin the IEP

17   development process, Parent did enough to communicate to the District her desire for a

18   reevaluation.

19       The court next considers whether the District unreasonably delayed R.M.'s

20   reevaluation after Parent's request.  The district reevaluated R.M. on September 22, 2021,

21   which was within 57 school days and 156 calendar days of Parent's April 20, 2021

22

1   request.  The court analyzes this delay in the circumstances and concludes that it was

2   reasonable.

3           First, the court considers the delay of 17 school days between Parent's request for

4   a reevaluation and the District's first response to Parent.  This initial delay is largely the

5   District's fault because Ms. Lawson disregarded Parent's request for a reevaluation and

6   follow-up emails.  There are, however, mitigating circumstances.  Ms. Lawson did not

7   intentionally ignore Parent's messages or decide to act without urgency—she simply

8   made a genuine mistake based upon Parent's email address.  Further, Parent's own lack

9   of urgency during this period contributed to the length of the delay.  Despite Ms.

10  Lawson's continuing silence, Parent did not attempt to reach out to any other employees

11  at the District, including Ms. Carver—who Parent had previously worked with in

12  obtaining an IEP for R.M.—or any other individual on the District's website from which

13  Parent obtained Ms. Lawson's name.  Parent testified that she opted not to contact other

14  employees at the District in part because that seemed like "overkill" for her request.  (AR

15  131.)  Furthermore, even though Parent had already obtained counsel before sending her

16  April 20, 2021 request, she still waited 17 school days without any response from Ms.

17  Lawson before having her attorney contact the District.  (AR 127.)  Thus, Parent's own

18  lack of urgency contributed to the initial delay in beginning R.M.'s reevaluation.

19          Second, the court considers that, once the District had actual knowledge of

20  Parent's request, it acted urgently.  Ms. Lawson responded to Parent almost immediately

21  after Parent's counsel contacted the District, offered to have a call that day, and initiated

22  the reevaluation process.  (AR 931, 2460.)  The District then sent Parent the necessary

1    paperwork to generate a consent form within two school days, and continued to

2    correspond outside of school hours to advance the process quickly.  (*See* AR 2163-66;

3    *see also* AR 2351 (2020-2021 school calendar).)

4        Third, the court considers that the District made up for lost time by working

5    diligently to complete R.M.'s reevaluation—including on days when school was not in

6    session.  (AR 142, 2472; *see also* AR 2351-52 (school calendar).)  Ultimately,

7    considering that Parent provided her updated consent on May 26, 2021 and the District

8    finalized R.M.'s reevaluation on September 22, 2021, the District completed the

9    reevaluation within 31 school days of Parent's consent.  (AR 142, 2472; *see also* AR

10   2351-52 (school calendar).)  This is within the 35 school days contemplated by

11   Washington's regulations, *see* WAC 392-172A-03015(3)(a), and is well within other

12   statutory timelines that courts have held reasonable, *see JG*, 552 F.3d at 798 (concluding

13   that a state statutory timeline of 45 school days between consent and evaluation "is not an

14   inconsistent interpretation of [the] IDEA's reasonable timeliness requirement").

15       Furthermore, given the complexity of R.M.'s reevaluation, the District reasonably

16   could have taken much longer after Parent consented.  When the District previously

17   evaluated R.M. in 2018, Parent agreed to allow 60 school days to complete the

18   reevaluation because of its complexity.  (AR 3221.)  In 2021, Parent, through her

19   attorney, continued to cite R.M.'s "complex learning profile" in communicating with the

20   District.  (AR 986.)  The 2021 reevaluation was also particularly challenging for the

21   District because (1) Parent asked to expand the scope of the reevaluation to include an

22   additional area, and (2) R.M.'s most recent primary teacher had passed away, and the

1    District had to identify and reach out to multiple other private instructors who had

2    worked with R.M.  (AR 285, 2165, 2479.)

3         Fourth, the court considers the total delay in conducting R.M.'s reevaluation.

4    Counting calendar days, rather than only school days, 156 days elapsed between Parent's

5    April 20, 2021 request and R.M.'s September 22, 2021 reevaluation.  The court

6    concludes that this delay was reasonable in the circumstances, particularly considering

7    how efficiently the District completed R.M.'s evaluation after obtaining Parent's consent.

8    *Cf. Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017) (concluding that

9    a total delay of 245 calendar days was reasonable in evaluating a child where neither the

10   district nor the parent acted with urgency, and the evaluation occurred within the relevant

11   state regulatory period of 45 school days after the parent provided consent).

12        In sum, despite some initial delay, the District completed R.M.'s reevaluation

13   within a reasonable time in the circumstances here, and Parent has not shown that the

14   District procedurally violated the IDEA.

15        2.  <u>The District did not Deprive R.M. of a FAPE by Failing to Have a New IEP</u>

16             <u>"In Effect" at the Start of the 2021-2022 School Year.</u>

17        Parent next argues that the IDEA required the District to have a new IEP in effect

18   for R.M. at the start of the 2021-2022 school year.  (Parent Br. 36-41; Parent Resp. at 12.)

19   She notes that she requested a FAPE on April 20, 2021, which left 41 school days

20   remaining until the District's 2021 summer break.  (Parent Resp. at 14-16.)  This, she

21   says, provided enough time before summer break to obtain her consent, reevaluate R.M.,

22   and develop a new IEP for R.M.  (*See id.* at 16-18.)  Accordingly, she argues that her

1  request obligated the District to develop a new IEP for R.M. quickly enough to allow

2  Parent enough time before the 2021-2022 school year to consider the new IEP and decide

3  whether to enroll R.M. in public school.  (*See id*.)

4      Under the IDEA, a school district must have an IEP in effect at the beginning of

5  each school year for each child with a disability in the district's jurisdiction.  20 U.S.C.

6  § 1414(d)(2)(A).  Even though children in private schools remain in a district's

7  jurisdiction, children placed in private schools by their parents need not be given IEPs,

8  and Districts do not need to update existing IEPs for those children while they remain in

9  private school.  *See Capistrano*, 21 F.4th at 1138 (citing 20 U.S.C. § 1412(a)(10)(A)); *see*

10  *also D.P. v. Council Rock Sch. Dist.*, 482 F. App'x 669, 673 (3d Cir. 2012) ("[A] school

11  district is only required to continue developing IEPs for a disabled child no longer

12  attending its schools when a prior year's IEP for the child is under administrative or

13  judicial review." (quoting *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th

14  Cir. 2002))).[8]

15      Once a parent requests an IEP or a FAPE, however, the school district must

16  provide it for children in private school.  *See Capistrano*, 21 F4th at 1138; *see also M.D.*,

17

---

18      [8] This distinction between parentally-placed private school children and other children
within a district's jurisdiction stems from the conditions that the IDEA imposes in exchange for

19  financial assistance.  *Compare* 20 U.S.C. § 1412(a)(10)(B)(i) (requiring IEPs for children placed
in private schools by public agencies), *with* 20 U.S.C. § 1412(a)(10)(A)(i) (making no mention

20  of requiring IEPs for children placed in private schools by their parents); *see also Capistrano*, 21
F.4th at 1138 (explaining the statutory distinction).  Washington's regulations implementing the

21  IDEA recognize this distinction as well.  *See, e.g.*, WAC 392-172A-03105(1) ("[E]ach school
district must have an IEP in effect for each student eligible for special education services *that it*

22  *is serving through enrollment in the district*.") (emphasis added).

1   539 F. Supp. at 391-92 (concluding that a district procedurally violated the IDEA by

2   failing to have an IEP in place at the start of the school year, after a parent of a child

3   parentally-placed in private school requested an IEP at the end of the preceding school

4   year).

5          Because Parent requested a FAPE before the end of the 2020-2021 school year,

6   IDEA required the District to have an IEP in place at the start of the 2021-2022 school

7   year.  20 U.S.C. § 1414(d)(2)(A).  By failing to do so, the District procedurally violated

8   the IDEA.[9]  The District counters that finding a procedural violation here will lead to

9   "absurd outcomes" because a Parent "could wait until the day before the new school year

10  and ask for a new IEP to be in effect the following day."  (District Br. at 34 & n.15.)  The

11  court disagrees, however, because not all procedural violations amount to a denial of a

12  FAPE, particularly when Parents do not allow school districts a reasonable amount of

13  time and when school districts respond reasonably and diligently.  *See J.B.*, 112 F.4th at

14  1160.  To explain, the court now assesses whether the District's procedural violation

15  *substantively* violated the IDEA.

16         If a school district fails to have an IEP in place by the start of the school year, that

17  failure by itself does not necessarily impede a child's right to a FAPE, particularly when

18

19         [9] The District argues that it did not procedurally violate the IDEA because it proposed
    implementing R.M.'s 2018 IEP at the beginning of the 2021-2022 school year as a stopgap until
20  it could implement a new IEP.  (*See* AR 2163-64.)  Parent, however, refused that offer, and
    implementing the 2018 IEP also would have procedurally violated the IDEA without Parent's
21  consent because that IEP had not been reviewed and was based upon a reevaluation of R.M. that
    was more than three years old.  *See* 20 U.S.C. § 1414(a)(2)(B)(ii) (requiring a reevaluation at
22  least once every three years unless the parent and school district agree otherwise), (d)(4)(A)(i)
    (requiring review of a child's IEP at least annually).

1    the parents rather than the district caused the delay.  *See C.H. v. Cape Henlopen Sch.*

2    *Dist.*, 606 F.3d 59, 69 (3d Cir. 2010) ("[W]e decline to hold that a school district is liable

3    for procedural violations that are thrust upon it by uncooperative parents.").

4    Accordingly, the Ninth Circuit and other courts have analyzed whether districts acted

5    reasonably in determining whether procedural violations—including delays in providing

6    a FAPE—rise to substantive violations of the IDEA.  *See JG*, 552 F.3d at 796

7    (concluding that the IDEA requires school districts to act "in a reasonable time");

8    *Bellflower*, 832 F. App'x at 496 (concluding that parents may receive reimbursement for

9    placing their children in private school if, in relevant part, the district did not make a

10   FAPE available "in a timely manner"); *A.B.*, 841 F. App'x at 395 (same); *see also* 20

11   U.S.C. § 1412(a)(10)(C)(ii) (prohibiting reimbursement for parents who place their

12   children in private school unless the school district has not made a FAPE available to the

13   child in a timely manner).

14        In the circumstances here, the court perceives no substantive violation of the

15   IDEA for two independent reasons.  First, the District offered to implement R.M.'s 2018

16   IEP at the start of the 2021-2022 school year as a stopgap measure, and, as the court

17   explains in greater detail below, the District simultaneously worked diligently to develop

18   a new IEP.  Parent never challenged the 2018 IEP in a due process hearing, and the

19   District believed that the 2018 IEP remained appropriate at the start of the 2021-2022

20   school year.  (AR 286-87, 294-95, 3198-200.)  Aside from the mere passage of time, the

21   record contains no evidence dating from the start of the 2021-2022 school year or earlier

22   that the 2018 IEP was inappropriate for R.M.  *See Baquerizo*, 826 F.3d at 1187

1  (explaining that courts should not judge IEPs "in hindsight, but instead based on the

2  information that was reasonably available to the parties at the time of the IEP").

3  Therefore, Parent fails to show that implementing the 2018 IEP while working diligently

4  to develop a new IEP would have substantively violated the IDEA.

5           Second, even if the District had not offered to implement the 2018 IEP, the

6  District did not substantively violate the IDEA because it finalized R.M.'s 2022 IEP in a

7  timely manner in response to Parent's request and acted reasonably throughout the

8  process.  Although the District did not finalize the IEP until well into the 2021-2022

9  school year, the District caused only a relatively brief initial delay in responding to Parent

10  and initiating R.M.'s reevaluation.  As the court discussed above, Parent also contributed

11  to that initial delay by acting without urgency, and the District then made up for lost time

12  by finalizing R.M.'s reevaluation within 31 school days—a laudable feat considering the

13  complexity of R.M.'s learning profile, Parent's request for an expanded scope for the

14  reevaluation, and difficulties in obtaining information about R.M.'s time in private

15  school.

16           Indeed, after the District began R.M.'s reevaluation, *all* of the delays in

17  developing and finalizing a new IEP were caused by a combination of Parent's delays

18  and demands and the complexity of meeting R.M.'s needs—i.e., by circumstances

19  outside the District's control.  For example, Parent waited approximately five months

20  after requesting a FAPE from the District to engage Dr. Davies to evaluate R.M.  (AR

21  139, 386.)  Parent also selected Dr. Davies because she perceived that Dr. Davies did

22  high-quality work, notwithstanding that she also knew that Dr. Davies takes time to do

1    evaluations and goes into "painstaking detail[.]"  (AR 142-43.)  Dr. Davies took over two

2    months to evaluate R.M. (AR 2736, 3197), and during this time Parent declined to

3    coordinate with the District to work more efficiently.  Specifically, Parent waited almost

4    three weeks to tell the District that she had retained Dr. Davies, and she then asked to

5    delay the District's October 2021 IEP meeting so that Dr. Davies could finish evaluating

6    R.M. before the IEP team met.  (AR 386, 2284.)

7        Moreover, after Dr. Davies finished her report, Parent did not provide the District

8    with a copy—and with copies of two other private reports—until the evening of the

9    rescheduled IEP meeting in November 2021.  (AR 3197.)  The District did not have

10   enough time to review these materials before the IEP team meeting, and Parent then

11   monopolized the scheduled time for the meeting by having Dr. Davies present her report

12   before the District presented its draft IEP.  (AR 456, 2860.)  Parent also declined an IEP

13   team meeting in December 2021 because she refused to excuse the District's

14   occupational therapist, who was not available.  (AR 2865.)  Finally, at a meeting in

15   January 2022, the District agreed to fund R.M.'s placement at private school starting on

16   January 21, 2022 as a concession to Parent.  (AR 3199, 3201.)

17       In sum, although the court disagrees with the ALJ and concludes that the District

18   procedurally violated the IDEA by failing to have a new IEP ready by the start of the

19   2021-2022 school year in response to Parent's request for a FAPE, the court also has no

20   difficulty concluding that the District acted reasonably in the circumstances and made a

21   FAPE available to R.M. in a timely manner.  Therefore, Parent has failed to show that the

22   District's failure to have a new IEP in place at the start of the 2021-2022 school year

impeded R.M.'s right to a FAPE, significantly impeded Parent's opportunity to participate in the decision-making process, or deprived R.M. of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E); WAC 392-172A-05105. On that basis, the court affirms the ALJ's decision.

## IV.    CONCLUSION

For the foregoing reasons, the court AFFIRMS the decision of the ALJ. The court DIRECTS the clerk to enter judgment for the District and to close this case.

Dated this 24th day of March, 2025.

JAMES L. ROBART
United States District Judge

ORDER - 33